**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

**KIMBERLY WATKINS,**
on behalf of A.W.E.,[1] a minor

       **Plaintiff,**

                          **Civil Action 2:17-cv-370**
     **v.**                      **CHIEF JUDGE EDMUND A. SARGUS, JR.**
                           **Chief Magistrate Judge Elizabeth P. Deavers**

**COMMISSIONER OF SOCIAL**
**SECURITY,**

       **Defendant.**

<u>**REPORT AND RECOMMENDATION**</u>

      Plaintiff, Kimberly Watkins ("Plaintiff"), on behalf of a minor child ("A.W.E."), brings

this action under 42 U.S.C. § 405(g) for review of a final decision of the Commissioner of Social

Security ("Commissioner") denying his application for Social Security Supplemental Security

Income benefits ("SSI").   This matter is before the United States Magistrate Judge for a Report

and Recommendation on Plaintiff's Statement of Errors (ECF No. 15), the Commissioner's

Memorandum in Opposition (ECF No. 18), Plaintiff's Reply (ECF No. 19), and the

administrative record (ECF Nos. 11 and 12).   For the reasons that follow, it is

**RECOMMENDED** that the Court **REVERSE** the Commissioner of Social Security's

nondisability finding and **REMAND** this case to the Commissioner and the ALJ under Sentence

Four of § 405(g).

---

[1] Pursuant to Fed. R. Civ. P. 5.2(a)(3), the name of an individual known to be a minor in a filing with the court may only include the minor's initials.

# I.  BACKGROUND

Plaintiff filed an application for benefits on behalf of A.W.E., a minor child, in November 2011, alleging that A.W.E. has been disabled since June 1, 2008, due Post-Traumatic Stress Disorder ("PTSD"), depression, speech impediment, left lazy eye, suicidal tendencies, difficulty seeing, difficulty being and dealing with others, difficulty focusing and concentrating, rapid weight gain, feelings of worthlessness, lack of motivation.  (R. at 186–99, 210.)  After initial administrative denials of his claim, A.W.E. was afforded a *de novo* hearing before administrative law judge (ALJ ) Neil Sullivan on August 7, 2013.  On August 23, 2013, the ALJ issued a decision denying A.W.E.'s SSI applications.  (R. at 14–26.)

Following the Appeals Council denial of Plaintiff's request for review, she filed an action in United States District Court under *Zupp[2] v. Commissioner of Social Security*, 2:14-cv-2545. This Court remanded A.W.E.'s claim for a new hearing and decision.  (R. at 981–99.)

The Appeals Council subsequently vacated and remanded ALJ Sullivan's decision on April 14, 2016.  (R. at 911-13.)  Plaintiff and A.W.E. appeared and testified at the subsequent administrative hearing, held by ALJ Judge Thomas L. Wang on January 13, 2017.  (R. at 875–910.)  On February 28, 2017, ALJ Wang issued a decision finding that A.W.E. was not disabled within the meaning of the Social Security Act.  (R. at 841–64.)  The Appeals Council did not assume jurisdiction within 60 days of the second ALJ decision.  Plaintiff then timely commenced the instant action.

---

[2] The original lawsuit was brought by A.W.E.'s grandmother Karen Zupp, who at the time was his legal guardian. Due to her health problems, she is no longer serving in that capacity. (R. at 903–04.)  The current Plaintiff is A.W.E.'s legal guardian at the time of filing.

## II.   HEARING TESTIMONY

At the administrative hearing on January 13, 2017, A.W.E. testified that he was diagnosed with depression and PTSD as well as asthma.   (R. at 877.)   A.W.E. testified that he likes to listen to music and play basketball, but he uses an inhaler for asthma.   When asked how he does in school, A.W.E. responded "not good."   (R. at 878.)   His grades in school are mostly Ds and Fs and "maybe one or two Cs."   (*Id.*)   He does not have an Individualized Education Plan ("IEP") or take any special courses.   (*Id.*)   He stated that he enjoys school, specifically gym and history class, but admitted has the most difficulty in English, Biology, and Math.   (R. at 879.)   He has a few friends, but they are not best friends.   (*Id.*)   A.W.E. testified that he is able to play videogames for 45 minutes to an hour at a time.   He is able to understand most of what he reads, but he sometimes has problems focusing.   (R. at 879–80.)

When A.W.E. gets depressed, he feels sad, angry, and anxious.   (R. at 880.)   He testified that he feels depressed 5 days a week.   (*Id.*)   A.W.E. gets depressed and angry because his mom is not there for him.   (R. at 881.)   He has nightmares about past traumatic experiences and thinks about what has happened to him "every day, all the time."   (R. at 882.)   He testified that he is taking medication but it does not seem to help.   (R. at 883.)   He has a new counselor who he was reportedly seeing in the middle of the month.   (*Id.*)   A.W.E. acknowledged a prior history of trying to harm himself, but has not felt the feelings recently.   (R. 883–84.)   A.W.E. testified that he moved in with his current guardian five months prior to this hearing, in August 2016.   (R. at 884–85.)   He testified that it has been the best place he lived besides with his grandmother.   (R. at 885.)

A.W.E.'s guardian, Plaintiff Kimberly Watkins, also testified at the administrative hearing.   She testified that she is trying to teach A.W.E. things that he should have been taught

3

earlier in life. She explained that she tries to provide love, guidance, and discipline. (R. at 887–88.) When asked if A.W.E. listens, she responded that he does, but he has problems with follow through. He sometimes becomes easily distracted. (R. at 888.) Plaintiff testified that A.W.E. is not organized and requires structure such as folders and a journal to keep more organized. (R. at 889.) She has noticed that A.W.E. "clicks" better with children who are 8–10 years old than those his own age. (R. at 890.) When she became A.W.E.'s guardian, she enrolled him in high school and he had only two credits for the ninth grade, so he was enrolled in a combination of tenth and ninth grade classes. (*Id.*) She reported the A.W.E. has difficulty in school and is tutored by her adult son. (R. at 891.) He was lying to Plaintiff and telling her he was doing his work because it was easier to lie than tell her the truth. (R. at 892.) Plaintiff testified that two of his teachers spoke to her regarding A.W.E.'s depression and performance. (R. at 892–93.) A.W.E. is still struggling in school, but his grades have improved. (R. at 893–94.)

She testified that A.W.E. is "clingy" with her family, "like he wants the love." (R. at 896.) Her family reciprocates as they "love it." She is worried about him being too "babied" and how he will get bullied at school if he shows his emotions too much. (R. at 897.) A.W.E. is very restless in his sleep and Plaintiff has had to move his bed away from the window because he was wrestling in his sleep and pulling the curtain rod down. (*Id.*) Plaintiff noted that when he has contact with his mother his depression and anger increases because he is unable to get her attention. (R. at 900.)

Plaintiff acknowledged that A.W.E. does get winded when walking back from taking the trash out. (R. at 895.) A.W.E. was placed back on asthmatic medications. (R. at 895–96.) She indicated the A.W.E. has lost some weight since in her care, as she has changed his diet in addition to his physical activity. (R. at 906–07.)

### III.     MEDICAL RECORDS

A review of medical evidence related to A.W.E.'s claim prior to his appeal is contained the Court's February 9, 2004, Report and Recommendation.   *Zupp v. Commissioner of Social Security*, No. 2:14-cv-2545 (ECF No. 21, filed in No. 2:14-cv-2545; R. at 984–90.)   In the interest of brevity, that review is incorporated herein by reference.   However, the Undersigned notes that A.W.E. was taken to the Scioto Paint Valley Crisis Center on September 27, 2011, following threats of suicide.   (R. at 986.)

**A.     Nationwide Children's Hospital**

On June 4, 2013, when A.W.E. was 11 years 11 months old, he was seen at the Center for Healthy Weight and Nutrition at Nationwide Children Hospital's for initial weight management. (R. at 1208.)   A.W.E.'s body mass index was above the 95th percentile and he was diagnosed with exogenous obesity.   (R. at 1214.)   His treatment plan was diet change.   (*Id.*)

In April and June 2013, A.W.E. saw a nurse practitioner at the Behavioral Medicine Clinic.   (R. at 1184–91.)   It was noted that A.W.E. had been previously diagnosed with major depressive disorder, PTSD, and sexual abuse with a Global Assessment of Functioning (GAF) score of 55.   (R. at 1188.)   On mental status examination, A.W.E. was found to be overweight, he exhibited an anxious/depressed mood, impaired attention/concentration, constructed affect, articulation issues, hallucinations of ghosts, and racing thought process.   (R. at 1184–85, 1189.) His psychotropic medication and therapy were continued.   (R. at 1186, 1190.)

In October 2014, A.W.E. was referred to Behavioral Health due to increased suicidal ideation.   He reported the trigger was recurrent memories of his aunt molesting and abusing him. He endorsed a plan of cutting his neck with a knife.   (R. at 1730.)   On mental status examination, his affect was flat throughout the session and he was "visibly relieved when

5

discussing a need for hospitalization." (R. at 1733–34.) A.W.E. stated "I thought you were going to send me home and then I wasn't sure what would happen." (R. at 1734.) He was diagnosed with major depressive disorder, PTSD, sexual abuse of child, and given a GAF score of 34. (R. at 1734.) He was discharged after three days based upon his presentation and collateral history from his grandmother. He appeared to be at his baseline and it was recommended that the most appropriate level of service appears to be higher level of outpatient treatment. (R. at 1725.)

He was admitted to the hospital for psychiatric treatment in March 2016 for four days due to daily suicidal ideation. (R. at 1630–35, 1700–23.) The record shows that he was seen in the Behavioral Health department initially reporting that he was having suicidal thoughts every day and had thoughts of self-harm. (R. at 1722.) He began staying with his guardian three weeks prior to this and she reported that he has crying spells, talks about dying, and exhibits low energy and motivation. (*Id.*) It was noted that A.W.E.'s grandmother was placed in hospice seven months prior, at which point his mother began caring for him until her drug use increased. (R. at 1718.) A lot of his suicidal thoughts are triggered by interactions with his mother. (R. at 1716.) His current guardian became aware of the situation and pursued caring for him. (R. at 1718.) A.W.E. reported that he hears a voice who is a spirit/ghost comforting him. (R. at 1706.) A.W.E. reported prior suicide attempts and was "really close" to suicide a "few weeks" ago, stating he held a knife to his throat, and admitted that he has "many" suicidal plans. (R. at 1706, 1710.) A.W.E. also reported previous self-cutting. (R. at 1707, 1709, 1719, 1722.) A.W.E. saw psychiatrist, Ivana, Balic, M.D. as part of his crisis team. (R. at 1630–35.) A.W.E reported he was placed with a family friend as a temporary guardian and was worried about his mother and his grandmother. (R. at 1631.) He also had to change schools. (*Id.*) A.W.E.

6

demonstrated normal psychomotor activities, normal speech, and appropriate language, but did not engage in any direct eye contact. (*Id.*) A.W.E. exhibited no hallucinations or delusions and evidenced an age appropriate attention span/concentration during this evaluation. (*Id.*) Dr. Balic also reported that A.W.E. demonstrated intact memory. (*Id.*) During his hospitalization, A.W.E was participating in therapy. (R. at 1632.) He was set up for counseling. (*Id.*)

A.W.E. attended counseling between March 2016 and May 2016. On April 14, 2016, A.W.E. presented for follow-up to his discharge following his admission for suicidal ideation. (R. at 1694–99.) It was noted that A.W.E. had attempted suicide a "long time ago[.]" (R. at 1695.) His guardian reported that A.W.E.'s depression had not improved and that Prozac has not been helpful. (*Id.*) Upon examination, A.W.E. was assessed as cooperative, but withdrawn, with diminished eye contact and abnormal social reciprocity. (R. at 1696.) He presented no suicidal or homicidal ideation and his thought process was linear and his associations were logical. (R. at 1697.) A.W.E. was assessed with poor insight and judgment for his age. (R. at 1698.) Plaintiff's Prozac prescription was discontinued as unhelpful and was prescribed Zoloft instead. (*Id.*)

A.W.E. continued to meet with a therapist to confirm his safety plan, and build a therapeutic relationship. (R. at 1684–1723.) By May 3, 2016, A.W.E.'s guardian reported that he was attention seeking and experienced some school related truancy issues. (R. at 1684.) During this session, the therapist noted that A.W.E. was well groomed and cooperative showing normal behaviors, with a full effect and linear thought processes. (R. at 1685.)

## B.     Adena Emergency Department

A.W.E. presented to the Adena Emergency Department on September 10, 2013, due to a left knee and hip injury which occurred the day prior at an athletic field and school. (R. at

1475–79.)   A.W.E. had pain on weight bearing.   (R. at 1475.)   On exam, there was moderate

tenderness in the left hip and limited range of motion secondary to pain, and moderate tenderness

and mild swelling was found at the in the left knee.   (R. at 1475–76.)   X-ray showed an internal

fixation screw of the proximal left femur was stable.   (R. at 1477.)   He was instructed to apply

ice, use crutches, wear a knee immobilizer, and stay home from school for 3 days.   (R. at 1478.)

On February 26, 2014, A.W.E. presented to the Emergency Department due to a left foot injury

with pain on weight bearing.   He tripped on curb and twisted his left foot.   (R. at 1488.)   He

was found to have moderate tenderness and a limping gait.   (R. at 1489.)   A.W.E. was

instructed to apply ice, wear post-op shoes as needed, and stay home from school that day.   (R.

at 1490.)

A.W.E. again hurt his left foot on March 8, 2015 and presented to the Emergency Department.

He had pain on weight bearing and swelling.   (R. at 1491.)   On exam, there was tenderness in

the foot/ankle and mild swelling.   (R. at 1491–92.)   There was limited movement secondary to

pain.   (R. at 1492.)   A splint was applied and A.W.E. was fitted for crutches.   (*Id.*)

     On April 2, 2015, A.W.E. returned to the emergency room after he kicked the divider

between 2 urinals in the school bathroom, tearing it off a wall, and was caught with metal and

sustained a laceration to the right arm.   (R. at 1494–95.)

**C.      Scioto Paint Valley Mental Health Center**

A.W.E. presented to Scioto Paint Valley Mental Health Center (Scioto) on October 23, 2014, reporting anxiety when trying to sleep, sleeping poorly, and exhaustion after sleep.   (R. at 1244.)   His absent parents weighed heavily on his life and he got attached when he saw them, only for them to leave again.   (*Id.*)   He reported comfort eating and gained a significant amount of weight.   (*Id.*)   A.W.E. also reported feeling fearful of going to school due to a history of bullying and trauma associated with sexual abuse.   (*Id.*)   He reported having ghost friends that talk to him.   (*Id.*)   A.W.E. was diagnosed with an adjustment disorder with mixed anxiety.   (R. at 1254.)   He was referred for a psychiatric evaluation.   (R. at 1253.)

When seen for an initial psychiatric evaluation on April 15, 2015, A.W.E.'s grandmother reported that A.W.E. had a lot of anger, irritability, and was binge eating.   A.W.E. got mad and became aggressive when he got upset.   A.W.E. felt angry and like he needed to cut himself.   At that time, he was taking Prozac and Clonidine.   At this time, he was in the 8th grade and struggling in school, but has done well in the past and likes science.   A.W.E. appeared obese with numerous cuts on his forearm and a scar on his right forearm.   On mental status examination, his thought content was preoccupied with inner sadness and issues related to anger and binge eating.   He was observed to have fair eye contact and soft speech, but demonstrated no abnormal movements and maintained euthymic mood with appropriate affect.   He exhibited no loose associations or flight of ideas, and no suicidal or homicidal ideations.   (R. at 1260.)   Added to A.W.E.'s diagnosis was PTSD and he was assigned a GAF score of 55.   (R. at 1266–67.)   The psychiatrist found that there is a need to rule out PTSD, and psychosis, moving forward.   A.W.E. does seem traumatized by sexual abuse, but nightmares/anxiety do not appear

to be related to this trauma, at this time.   A.W.E.'s report of "speaking to ghosts, that are friendly," invokes curiosity, but needs further inquiry.   (R. at 1267.)

The record documents that he continued to treat at Scioto through at least February 2016. (R. at 1265–1301.)   He continued to show no suicidal or homicidal ideations, reporting only some intermittent sadness and was noted generally to be doing well on his prescribed medication regime. (*Id.*)

## D.     Consultative examination: John S. Reece, Psy.D.

On October 26, 2016, Dr. Reece evaluated AW.E. for disability purposes.   (R. at 1625–28.)   At the time of this evaluation, A.W.E was 15 years old and living with his great-aunt/legal guardian.   (R. at 1625.)   When asked about his disability, A.W.E. responded, "I don't [believe I have a disability.]"   (*Id.*)   A.W.E. moved frequently while growing up and had legal problems for truancy.   (*Id.*)   Both of his parents have had problems with depression, drugs, and alcohol. (*Id.*)   A.W.E. was physically and sexually abused between the ages of three and seven. (R. at 1625–26.)   A.W.E. used marijuana daily for three months, but had no drugs, alcohol, or tobacco since February 2016.   (R. at 1626.)   He was involved in outpatient counseling in the past and was taking Zoloft, melatonin, and Vistaril.   (*Id.*)   On exam, A.W.E. exhibited an outward sign of anxiety in the form of fidgeting.   (*Id.*)   He was notably neat and clean and showed no eccentric or impulsive behaviors.   (*Id.*)   His eye contact was good and facial expressiveness was normal.   His tone of voice was normal and Dr. Reece observed no psychomotor retardation or agitation.   A.W.E. reported no sleep deficits, no crying spells, no significant depression, no irritability or anger, and indicated his energy was normal.   (R. at 1627.)   A.W.E. did report that he worries excessively about the well-being of his mother and grandmother.   (*Id.*)   Dr. Reece diagnosed trauma and stress-related disorder and cannabis use disorder in remission.   (*Id.*)   As

to his functional assessment, Dr. Reece noted that, as to the domain of the ability and limitations in acquiring and using information, A.W.E. was responsive to direct questions and understood instructions. (R. at 1628.) As to A.W.E.'s ability to attend to and complete tasks, Dr. Reece indicated that A.W.E. had no problems with inattention or impulsivity and reported no deficits with authority. (*Id*.) Regarding A.W.E.'s ability to interact and relate with others, Dr. Reece noted that A.W.E. was cooperative and reportedly gets along well with peers in school and at home and reportedly has no authority problems at home or school. (*Id*.) As to the domain of self-care, Dr. Reece concluded that A.W.E.'s level of self-care "is age-appropriate, but he requires prompts to bathe. Reportedly a hobby/interest is basketball. No emotional or dyscontrol problems were reported." (*Id*.)

**E.** **State agency review**

State agency reviewing psychologist, Tonnie Hoyle, Psy.D., state agency pediatrician, Louis Goorey, M.D. and state agency speech-language pathologist, Melissa Hall, M.A. opined in January 2012, that A.W.E. did not meet, medically equal, or functionally equal any listing. (R. at 73.) They opined that A.W.E. was not limited in the domains of acquiring and using information, attending and completing tasks, and moving about and manipulating objects; he was less than markedly limited in the domains of interacting and relating with others, caring for himself, and health and physical well-being. (R. at 72–73.)

In July 2012, state-agency psychologist, Caroline Lewin, Psy.D.; state agency pediatrician, Janice Taylor, M.D.; and state agency speech-language pathologist, Lisa Lynch, M.A. reviewed the mental health evidence upon reconsideration and affirmed the initial assessment. (R. at 84–96.)

# IV. THREE-STEP INQUIRY

The Commissioner uses a three-step process to determine if a child applicant is disabled and entitled to benefits: (1) if the child is engaged in substantial gainful activity, the child is not disabled; (2) if the child does not have a severe medically determinable impairment or combination of impairments, the child is not disabled; and (3) if the child's impairment(s) do not meet, medically equal, or functionally equal the listings, the child is not disabled. 20 C.F.R. § 416.924.

At the third step, an impairment functionally equals a listing if it results in "marked" limitations in two domains of functioning or an "extreme" limitation in one domain. 20 C.F.R. § 416.926a(a). The regulations identify six domains of functioning to be considered: (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for yourself; and (6) health and physical well-being. 20 C.F.R. § 416.926a(b)(1).

A claimant has a "marked" limitation if the claimant's impairments seriously interfere with the claimant's ability to independently initiate, sustain, or complete activities. 20 C.F.R. § 416.926(e)(2)(i). A "marked" limitation is more severe than "moderate" and less severe than "extreme." 20 C.F.R. § 416.926(e)(2)(i). An impairment causes an "extreme" limitation when it interferes very seriously with the claimant's ability to independently initiate, sustain, or complete activities. 20 C.F.R. § 416.926(e)(3)(i). In determining the effect of an impairment on the six domains, the Commissioner considers information from medical sources, parents and teachers, and consultative examiners. 20 C.F.R. § 416.926a(b)(3). A child is considered to functionally meet the disability listings when he or she has a marked limitation in at least two out

12

of six "domains" of functioning, or an extreme limitation in only one domain.   20 C.F.R. §

416.926a(a); *Jordan ex rel. C.R.J. v. Comm'r of Soc. Sec.*, 940 F. Supp. 2d 602, 610 (S.D. Ohio

2013).

## V.   ADMINISTRATIVE DECISION

On February 28, 2017, ALJ Wang issued his decision.   (R. at 841–64.)   The ALJ found

that A.W.E. has the following severe impairments: status post open reduction and internal

fixation of both bones in the right forearm; status post fixation of the proximal left femur;

asthma; refractive amblyopia of the left eye; obesity; obstructive sleep apnea (OSA); type II

diabetes mellitus; speech articulation disorder; a depressive disorder; a posttraumatic stress

disorder (PTSD); an anxiety disorder; and an attention deficit hyperactivity disorder ("ADHD")

within the meaning of 20 C.F.R. § 416.924(c).   (R. at 845.)   He concluded, however, that

A.W.E. does not have an impairment or combination of impairments that meets or medically

equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.

(*Id.*)   In the six domains used to determine a child's functional equivalence, the ALJ found that

A.W.E. has "less than marked" limitation in the domains of acquiring and using information

interacting, relating with others, and caring for oneself (R. at 856–63); "marked" limitation in the

domain of health and physical well-being (R. at 863–64); and "no" limitation in the domains of

attending and completing tasks, and moving about and manipulating objects.   (R. at 857–61.)

The ALJ consequently concluded that A.W.E. was not disabled within the meaning of the Social

Security Act.   (R. at 864.)

## VI.       STANDARD OF REVIEW

When reviewing a case under the Social Security Act, the Court "must affirm the

Commissioner's decision if it 'is supported by substantial evidence and was made pursuant to

proper legal standards.'" *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009)

(quoting *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007)); *see also* 42 U.S.C. §

405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by

substantial evidence, shall be conclusive . . . ."). Under this standard, "substantial evidence is

defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant

evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers*, 486

F.3d at 241 (quoting *Cutlip v. Sec'y of Health & Hum. Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).

Although the substantial evidence standard is deferential, it is not trivial. The Court

must "'take into account whatever in the record fairly detracts from [the] weight'" of the

Commissioner's decision. *TNS, Inc. v. NLRB*, 296 F.3d 384, 395 (6th Cir. 2002) (quoting

*Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487 (1951)). Nevertheless, "if substantial

evidence supports the ALJ's decision, this Court defers to that finding 'even if there is

substantial evidence in the record that would have supported an opposite conclusion.'" *Blakley*

*v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir.

1997)).

Finally, even if the ALJ's decision meets the substantial evidence standard, "'a decision

of the Commissioner will not be upheld where the SSA fails to follow its own regulations and

where that error prejudices a claimant on the merits or deprives the claimant of a substantial

right.'" *Rabbers*, 582 F.3d at 651 (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746

(6th Cir. 2007)).

## VII.    ANALYSIS

Plaintiff advances two contentions of error.   First, she contends that the ALJ's finding that A.W.E.'s impairments were not functionally equivalent to the listings was unsupported by substantial evidence.   Next, Plaintiff argues that the ALJ erred in evaluating A.W.E.'s ability to care for himself.

However, although not raised by the parties, the Undersigned notes that the report of the consultative examiner, Dr. Reece, dated October 26, 2016 ("the Reece Report"), is unsigned. (R. at 1625–29.)   *See Choate v. Comm'r of Soc. Sec.*, No. 17-10096, 2018 WL 1354471, at *8 (E.D. Mich. Feb. 24, 2018) (stating that a court may *sua sponte* raise legal issues), *adopted by* 2018 WL 1326293 (E.D. Mich. Mar. 15, 2018).   The regulations require that a consultative examiner must sign his or her report:

> All consultative examination reports will be personally reviewed and signed by the medical source who actually performed the examination.   This attests to the fact that the medical source doing the examination or testing is solely responsible for the report contents and for the conclusions, explanations or comments provided with respect to the history, examination and evaluation of laboratory test results. The signature of the medical source on a report annotated "not proofed" or "dictated but not read" is not acceptable.   A rubber stamp signature of a medical source or the medical source's signature entered by any other person is not acceptable.

20 C.F.R. § 404.1519n(e); *see also* 20 C.F.R. § 404.1519o.   Even if substantial evidence supports the administrative decision, the Court must remand the action if the ALJ violated applicable regulations:

> Regardless of whether substantial evidence exists to support the Commissioner's decision, violation of the regulations merits a remand, absent a showing of harmless error.   An elemental principle of administrative law is that agencies are bound to follow their own regulations.   *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 545 (6th Cir. 2004) (remanding claim for disability where Commissioner failed to comply with regulations requiring provision of good reasons for discounting a treating source's opinion).   Whether a procedural error is "harmless" in this context does not depend on the likely outcome of the case but instead on whether

the Commissioner violated a regulation establishing a procedural right designed to protect the claimant. *Wilson*, 378 F.3d at 546–47 (defining "substantial right").

*Cramer v. Astrue*, No. 1:08-cv-176, 2009 WL 2927286, at *5 (E.D. Tenn. Sept. 3, 2009) (remanding action where consultative examiner's report was unsigned); *see also Blankenship v. Comm'r of Soc. Sec.*, No. 1:14-cv-1012, 2017 WL 396763, at *5–6 (W.D. Tenn. Jan. 30, 2017) (same); *Petty v. Astrue*, No. 3:10-cv-426, 2012 WL 252729, at *2 (E.D. Tenn. Jan. 6, 2012) (same), *adopted by* 2012 WL 253206 (E.D. Tenn. Jan. 26, 2012). Therefore, "[a]lthough the Commissioner may rely on an unsigned report in a favorable decision, the regulations forbid the use of an unsigned report in an unfavorable decision." *Cramer*, 2009 WL 2927286, at *5 (citing 20 C.F.R. §§ 404.1519o, 414.919o; *Scott v. Shalala*, 898 F. Supp. 1238, 1251 (N.D.Ill.1995)). "The regulations do not permit the adjudicator simply to ignore or omit an unsigned report: the adjudicator must either acquire a signature from the actual examiner or else order another consultative examination for the claimant." *Id.* (citing 20 C.F.R. §§ 404.1519o(b), 414.919o(b); HALLEX I-2-5-20 (Sept. 28, 2005)). Accordingly, "[a]ny use of an unsigned consultative examination report in an unfavorable decision is an error requiring a remand under the rule articulated in *Wilson v. Commissioner of Social Security*, 378 F.3d 541 (6th Cir. 2004)." *Id.*; *see also Blankenship*, 2017 WL 396763, at *5–6 (remanding action where consultative examiner's report was unsigned); *Petty*, 2012 WL 252729, at *2 (E.D. Tenn. Jan. 6, 2012) (same), *adopted by* 2012 WL 253206 (E.D. Tenn. Jan. 26, 2012).

Here, the ALJ assigned "some weight" to the unsigned Reece Report when denying benefits. (R. at 854–55). Accordingly, even if substantial evidence supports the ALJ's decision, the action must be remanded because the ALJ violated regulations when relying on this

unsigned consultative examiner's report. 20 C.F.R. §§ 404.1519n(e), 404.1519o; *Blankenship*, 2017 WL 396763, at *5–6; *Petty*, 2012 WL 252729, at *2; *Cramer*, 2009 WL 2927286, at *5.[3]

Even if the Reece Report was signed, the Undersigned finds that the action must still be remanded for other reasons. In denying benefits, the ALJ relied at length on Dr. Reece's report, among other evidence, when concluding that A.W.E. experienced general symptom control (when compliant with medications and treatment) despite A.W.E.'s reported mental health conditions and symptoms. (R. at 851.) However, a review of the record reveals that the Reece Report is internally inconsistent and contradicts other evidence in the record. On the first page of his report, Dr. Reece notes that A.W.E.'s legal guardian reported that A.W.E. "has attempted suicide" (R. at 1625), but on the second page, Dr. Reece states that A.W.E. "reportedly has never attempted suicide." (R. at 1626.) As previously noted, the record reflects that A.W.E. previously attempted suicide. (R. at 1695, 1706, 1710.) In addition, Dr. Reece noted that A.W.E. "reportedly has no history of hallucinations or of delusional thinking" (R. at 1627), but the record reflects that A.W.E. had a history of seeing and hearing ghosts. (*See, e.g.*, R. at 706, 712, 1185, 1189, 1244, 1267.)

The ALJ does not acknowledge this internal inconsistency or these contradictions with other evidence in the record. Instead, the ALJ assigned "some weight" to Dr. Reece's opinion and observations, reasoning as follows:

---

[3]Because this finding obviates the need for analysis of Plaintiff's assignments of error, the Undersigned need not, and does not resolve whether the alternative bases support reversal and remand. Nevertheless, on remand, the ALJ may consider Plaintiff's assignments of error, if appropriate. *Cox v. Comm'r of Soc. Sec.*, No. 2:13-cv-1203, 2015 WL 1000648, at *3 n.1 (S.D. Ohio Mar. 5, 2015).

> While Dr. Reece did not provide specific functional limitations regarding the claimant's mental health functioning, the examiner did provide his medical observations of the claimant during the face-to-face evaluation. The undersigned affords some weight to the mental observations and diagnoses provided by Dr. Reece as he is a medical psychological specialist and is familiar with evaluating mental health conditions and symptoms and assessing mental limitations, especially as they relate to child and adult functioning. Here his observations and statements are not inconsistent with the statements from treatment providers and other consultants of record. Therefore, the undersigned provides Dr. Reece some weight.

(R. at 854–55.) Based on this record, it is unclear whether the ALJ considered the internal inconsistency or that the Reece Report contradicted other record evidence when deciding to afford "some weight" to Dr. Reece's opinion and observations. The ALJ's failure in this regard precludes meaningful review. *See Tyson v. Comm'r of Soc. Sec.*, No. 1:16-cv-130, 2017 WL 1130028, at *5 (W.D. Mich. Mar. 27, 2017) ("It is more than merely 'helpful' for the ALJ to articulate reasons . . . for crediting or rejecting particular sources of evidence. It is absolutely essential for meaningful appellate review." (quoting *Hurst v. Sec'y of Health and Human Servs.*, 753 F.2d 517, 519 (6th Cir. 1985)); *Poole v. Berryhill*, No. 16-10912, 2017 WL 4960167, at *1 (E.D. Mich. Sept. 13, 2017) (finding that meaningful review was precluded where the ALJ "failed in meaningful respects to consider the entire period at issue, failed to sufficiently explain the weight that she gave to the opinions in the record, and generally failed to provide a logical bridge between the evidence and the result"); *Shrader v. Astrue*, No. 11-13000, 2012 WL 5383120, at *6 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked.").

Moreover, it appears that Dr. Reece did not review A.W.E's records related to his admittance for suicidal ideation in March 2016. (R. at 1626 (acknowledging that A.W.E. was admitted to Children's Hospital for psychiatric treatment in March 2016 and that A.W.E. was in

18

residential treatment, but acknowledging that "no details given").) If Dr. Reece had reviewed

these records, he would have learned, among other things, that A.W.E. had presented for suicidal

ideation; it was considered to increase his prescription for Prozac during admittance; he recently

held a knife to his throat; he engaged in self-cutting; and he had prior suicide attempts. (*See*,

*e.g.*, R. at 1703–10.) This evidence may have had an impact on Dr. Reece's opinion and

observations, particularly on his opinion as to A.W.E.'s ability in the domain of self-care.[4] *See*

20 C.F.R. § 416.926a(k) (providing that, *inter alia*, the domain of caring for yourself addresses

"how well you maintain a healthy emotional and physical state, including how well you get your

physical and emotional wants and needs met in appropriate ways; how you cope with stress and

changes in your environment"); *see also* S.S.R. 09-7p. Accordingly, based on the present

record, the Undersigned is unable to meaningfully review the ALJ's decision based, in part, on

Dr. Reece's opinion. *Cf. Shrader*, 2012 WL 5383120, at *6.[5]

## VIII. CONCLUSION

In sum, from a review of the record as a whole, the Undersigned concludes that the ALJ

violated regulations when relying on this unsigned consultative examiner's report, requiring

remand. Even if the ALJ did not violate these regulations, remand is warranted because the

Undersigned is unable to conduct a meaningful review of the ALJ's decision. Accordingly, it is

---

[4] A child is considered to functionally meet the disability listings when he or she has a marked limitation in at least two out of six "domains" of functioning, or an extreme limitation in only one domain. 20 C.F.R. § 416.926a(a); *Jordan ex rel. C.R.J. v. Comm'r of Soc. Sec.*, 940 F. Supp. 2d 602, 610 (S.D. Ohio 2013). Here, the ALJ found that A.W.E. had a marked limitation in the domain of health and physical well-being. (R. at 864.)

[5] As in the prior recommendation in the *Zupp* action (R. at 997), the Undersigned is concerned that certain portions of the claimant's treatment records are illegible. (*See*, *e.g.*, R. at 1195, 1202–06.)

**RECOMMENDED** that the Court **REMAND** this case to the Commissioner under Sentence Four of § 405(g) for further consideration consistent with this Report and Recommendation.

## IX. PROCEDURE ON OBJECTIONS

If any party seeks review by the District Judge of this Report and Recommendation, that party may, within fourteen (14) days, file and serve on all parties objections to the Report and Recommendation, specifically designating this Report and Recommendation, and the part in question, as well as the basis for objection. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). Response to objections must be filed within fourteen (14) days after being served with a copy. Fed. R. Civ. P. 72(b).

The parties are specifically advised that the failure to object to the Report and Recommendation will result in a waiver of the right to *de novo* review by the District Judge and waiver of the right to appeal the judgment of the District Court. *See, e.g.*, *Pfahler v. Nat'l Latex Prod. Co.*, 517 F.3d 816, 829 (6th Cir. 2007) (holding that "failure to object to the magistrate judge's recommendations constituted a waiver of [the defendant's] ability to appeal the district court's ruling"); *United States v. Sullivan*, 431 F.3d 976, 984 (6th Cir. 2005) (holding that defendant waived appeal of district court's denial of pretrial motion by failing to timely object to magistrate judge's report and recommendation). Even when timely objections are filed, appellate review of issues not raised in those objections is waived. *Robert v. Tesson*, 507 F.3d 981, 994 (6th Cir. 2007) ("[A] general objection to a magistrate judge's report, which fails to specify the issues of contention, does not suffice to preserve an issue for appeal . . . .") (citation omitted)).

August 6, 2018                                  */s/Elizabeth A. Preston Deavers*
                                                Elizabeth A. Preston Deavers
                                                Chief United States Magistrate Judge